# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS. A-3392-24
           A-3393-24

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

      Plaintiff-Respondent,

v.

M.M. and P.D.,

      Defendants-Appellants.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF L.S.D.,
a minor.

_____

      Submitted May 13, 2026 – Decided June 9, 2026

      Before Judges Paganelli and Vanek.

      On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Sussex County, Docket No. FG-19-0011-25.

Jennifer N. Sellitti, Public Defender, attorney for appellants (Christine O. Saginor and Louis W. Skinner, Designated Counsel, on the joint briefs).

Jennifer Davenport, Attorney General, attorney for respondent (Janet Greenberg Cohen, Assistant Attorney General, of counsel; Michelle McBrian, Deputy Attorney General, on the brief).

Jennifer N. Sellitti, Public Defender, Law Guardian, attorney for minor (Meredith Alexis Pollock, Deputy Public Defender, of counsel; David B. Valentin, of counsel and on the brief).

PER CURIAM

In these consolidated matters, defendants M.M. (Mary) and P.D. (Peter) appeal from a June 10, 2025 Family Part order terminating their parental rights and granting plaintiff Division of Child Protection and Permanency (the Division) guardianship of minor child, L.S.D. (Lily), with the plan that she be adopted.[1]  Defendants argue the trial court erred in finding the Division had proven by clear and convincing evidence the four prongs of the best-interests test necessary for the termination of parental rights.  See N.J.S.A. 30:4C-15.1(a). The Division and Lily's law guardian contend the judgment is supported by

---

[1]  We refer to the parties in this case using initials and pseudonyms to protect their privacy and the confidentiality of these proceedings.  R. 1:38-3(d)(12).

substantial evidence in the record. Having reviewed the record in light of the parties' contentions and the applicable law, we affirm.

## I.

The facts and evidence are detailed in Judge Michael Paul Wright's oral decision setting forth his reasons for the June 10, 2025 order after a three-day trial. Accordingly, we only summarize the salient facts necessary to provide context for our opinion.

Defendants are the biological parents of Lily, now ten years old. The Division became involved with the family in 2017 based on a report from Peter that Mary was using drugs while Lily was in her care. Because Lily's needs appeared to have been met, the Division closed the case.

The Division received additional referrals regarding Mary between 2017 and 2020, citing concerns for Lily's safety based on both defendants' substance abuse and Mary's arrest on drug charges. In October 2019, the Division received a referral concerning Mary's arrest for possession of heroin and drug paraphernalia. The Division was unable to locate the family for several months. On February 28, 2020, both parents were arrested on outstanding warrants. Peter was incarcerated, Mary was released later that evening, and Lily was removed from defendants' care and placed in a non-relative resource home. The court

later upheld the removal, finding ongoing substance abuse concerns for both parents and imminent risk to Lily's safety as a result.

The court ordered both parents to complete psychological and substance-abuse evaluations, submit to random drug screens, and have their visitation supervised. Upon release from custody, Peter tested positive for opiates, cocaine, fentanyl, and suboxone. Mary tested positive for opiates, cocaine, and fentanyl. Although the Division repeatedly referred both parents for services, they delayed or failed to complete required treatment and evaluations.

In February 2021, the Center for Evaluation and Counseling issued a report finding both parents required mental-health services, parenting-skills development, and substance-abuse treatment, and further concluded their outlook for compliance was poor. Peter admitted that when he used drugs, "drugs c[a]me before anything," and acknowledged he had not consistently been present for Lily during the years preceding her removal. Mary claimed she had periods of sobriety and minimized the effect of her substance use on her parenting.

The Division filed a guardianship complaint in March 2021. In July 2021, Dr. Elizabeth Stilwell conducted psychological and bonding evaluations. Dr. Stilwell concluded both parents had poor prognoses for change and expressed

A-3392-24

concern that Lily had developed insecure attachments because of the instability she experienced in defendants' care. Although Lily maintained emotional attachments to her parents, Dr. Stilwell opined those attachments were not consistently healthy or development-promoting.

Mary continued to struggle with substance abuse throughout 2021 and 2022. She repeatedly tested positive for cocaine, fentanyl, and other substances, failed to comply with intensive outpatient treatment, and declined individual therapy intended to address underlying trauma and grief issues.

The first guardianship trial concluded in December 2021. In May 2022, the court denied the Division's application to terminate parental rights, finding the Division had not sufficiently explored alternatives to termination and concluding termination at that time would cause significant harm to Lily.

Following the denial of guardianship, Peter began making progress. After a March 2022 incarceration for violating probation, he entered treatment at Damon House and later transitioned to Oxford House. He completed intensive outpatient treatment through New Brunswick Counseling Center, maintained a period of sobriety, obtained employment, and secured housing with the Division's assistance. In February 2023, Dr. Stilwell updated her evaluations and opined at that time she did not recommend termination because Peter had

5

meaningfully engaged in treatment, Lily remained attached to her parents, and there was no immediate alternative permanency option.

The court approved a reunification plan in April 2023. The Division assisted Peter in obtaining an apartment and provided financial support for his housing and furnishings. Lily was reunited with Peter on November 5, 2023. The court's reunification order barred Peter from permitting Mary to be in contact with Lily.

Mary, however, did not make comparable progress. She continued to use heroin and crack cocaine throughout 2023, including while pregnant with another child who demonstrated exposure to substances when tested at birth. Mary remained unstable and failed to engage consistently with treatment or visitation.

By March 2024, concerns regarding Peter's sobriety and parenting resurfaced. Peter refused drug screens, Lily's school reported he appeared intoxicated and slurred his speech, and Lily missed school and counseling sessions. Peter admitted he had relapsed and tested positive for cocaine. The Division also learned Peter had permitted Mary to have unauthorized contact with Lily and had allowed Mary to stay overnight with them in violation of court orders.

A-3392-24

When the Division attempted to locate Lily in March 2024, Peter initially refused to disclose her whereabouts. Lily was eventually located at school. She initially lied about Mary's presence because Peter had instructed her not to disclose having contact with Mary, but later disclosed that Mary had been living with her and Peter for approximately one month.

On March 15, 2024, the Division removed Lily for a second time. The court upheld the removal, finding ongoing risk to Lily's safety and welfare.

After the second removal, Peter's condition deteriorated. He resumed extensive substance abuse, repeatedly tested positive for cocaine, fentanyl, morphine, marijuana, and other substances, failed to attend treatment despite multiple Division referrals, and lost his housing and employment. Although the Division arranged detox placements, transportation, temporary hotel accommodations, and additional services, Peter repeatedly failed to appear for admissions to substance abuse treatment. Mary similarly failed to stabilize. She continued to use heroin and cocaine daily, remained homeless and unemployed, refused or failed to follow through with treatment referrals, and inconsistently attended visitation with Lily.

When defendants did attend visitation, the Division caseworkers became concerned with their sobriety. For instance, they observed that Peter appeared

7

sluggish and nodded off during visits.  Because both parents tested positive for fentanyl, the court ultimately modified the visitation plan to prohibit physical contact with Lily.

Since February 2023, except during the brief period of reunification with Peter, Lily has resided with resource parents, who have expressed a clear commitment to adoption and an unwillingness to pursue kinship legal guardianship (KLG).  Throughout the litigation, the Division explored multiple placements, including out-of-state relatives, but each was ruled out because the proposed caregiver declined, was unsuitable, failed to obtain Interstate Compact on the Placement of Children (ICPC) approval, or was otherwise determined not to be in Lily's best interests.

The second guardianship trial occurred over three days in February and March 2025.  Neither defendant was present for trial and their whereabouts were unknown.  The court denied adjournment requests because defendants and their counsel had notice of the trial dates and the Division had made extensive efforts to remind defendants of trial and offered to transport them to court.  Mary ultimately appeared remotely from jail on June 6, 2025, when Judge Wright issued his decision on the record.

A-3392-24

Neither Lily's law guardian nor defendants called witnesses at trial. The Division called five Division caseworkers with historical knowledge of the family and Dr. Elizabeth Stilwell, whom the judge qualified as an expert in forensic psychology, attachment, bonding, and parental fitness. Judge Wright found all the witnesses credible and their testimony largely unrebutted.

Dr. Stilwell testified Mary had made no meaningful progress toward becoming a viable parenting option and remained unpredictable, emotionally unstable, and unable to provide Lily with a secure attachment. Dr. Stilwell further opined Peter's relapse following reunification, ongoing substance abuse, housing instability, and inconsistent visitation demonstrated a poor prognosis for safe parenting.

Dr. Stilwell also testified Lily displayed "fawning" behavior, which she described as a trauma response developed in reaction to instability, abandonment, and insecure attachments. Dr. Stilwell concluded Lily's most secure attachments were with her resource parents and therapist and opined that permanency through adoption would do more good than harm.

Prior to trial, Dr. Stilwell conducted a bonding evaluation between Lily and her resource parents. They informed her that initially Lily was placed with them prior to being reunified with Peter, and they stayed in contact with Lily

while she was in Peter's care. They have cared for Lily for the past two years since the Division re-placed her after the second removal. The resource parents reported they were unwilling to consider KLG and were committed to adoption but were amenable to continuing contact with Peter and other family post-adoption so long as the relationships are healthy.

On June 6, 2025, the judge entered an order terminating defendants' parental rights for the reasons set forth in its oral decision. Judge Wright concluded the Division had proven all four prongs of the best-interests test by clear and convincing evidence as to both parents. This appeal followed.

II.

The termination of parents' rights to raise their children is a matter of constitutional magnitude. See In re Guardianship of K.H.O., 161 N.J. 337, 346 (1999). Those rights, however, are "not absolute" and are limited "by the State's parens patriae responsibility to protect children whose vulnerable lives or psychological well-being may have been harmed or may be seriously endangered by a neglectful or abusive parent." N.J. Div. of Youth & Fam. Servs. v. F.M., 211 N.J. 420, 447 (2012). "Children have their own rights, including the right to a permanent, safe and stable placement." N.J. Div. of Youth & Fam. Servs. v. C.S., 367 N.J. Super. 76, 111 (App. Div. 2004). Our courts have

acknowledged "the need for permanency of placements by placing limits on the time for a birth parent to correct conditions in anticipation of reuniting with the child." Ibid. Thus, a parent's interest must, at times, yield to the State's obligation to protect children from harm. See N.J. Div. of Youth & Fam. Servs. v. G.M., 198 N.J. 382, 397 (2009).

Consequently, the law requires a balancing of those two competing interests: the parents' constitutionally protected right to raise their children absent state interference, and the State's responsibility to protect the welfare of children. N.J. Div. of Child Prot. & Permanency v. D.C.A., 256 N.J. 4, 20 (2023). That balancing "is achieved through the best interests of the child standard." Ibid. (quoting K.H.O., 161 N.J. at 347). The Legislature codified that standard in N.J.S.A. 30:4C-15.1(a). See id. at 21 (recognizing the Legislature codified "the best[-]interests test" when it enacted N.J.S.A. 30:4C-15.1(a)).

Thus, when seeking termination of parental rights, the Division must establish, by clear and convincing evidence, the following four-prong criteria set forth in N.J.S.A. 30:4C-15.1(a), as amended by the Legislature in 2021:

> (1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;

A-3392-24

(2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm;

(3) The [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and

(4) Termination of parental rights will not do more harm than good.

See N.J. Div. of Youth & Fam. Servs. v. A.W., 103 N.J. 591, 612 (1986) (applying the clear-and-convincing standard in a parental-rights termination case).

These four prongs "are not discrete and separate" but rather "overlap to offer a full picture of the child's best interests." N.J. Div. of Youth & Fam. Servs. v. R.G., 217 N.J. 527, 554 (2014). Indeed, "[t]he first two prongs [of the best-interests test], N.J.S.A. 30:4C-15.1(a)(1) and (2), are 'the two components of the harm requirement' and 'are related to one another.'" N.J. Div. of Child Prot. & Permanency v. T.D., 454 N.J. Super. 353, 380 (App. Div. 2018) (quoting In re Guardianship of D.M.H., 161 N.J. 365, 379 (1999)). "Therefore, 'evidence that supports one informs and may support the other as part of the

comprehensive basis for determining the best interests of the child.'" Ibid. (quoting D.M.H., 161 N.J. at 379).

We give substantial deference to the court's opportunity to have observed the witnesses first-hand and to evaluate their credibility. R.G., 217 N.J. at 552. The "general deference on appeal is also informed by the Family Part judge's 'feel of the case,'" N.J. Div. of Child Prot. & Permanency v. D.H., 469 N.J. Super. 107, 116 (App. Div. 2021) (quoting N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 104 (2008)), and by the Family Part's "special expertise in matters related to the family," F.M., 211 N.J. at 448.

Accordingly, we defer to the court's factual findings "and uphold those findings if they are grounded in substantial and credible evidence in the record." D.C.A., 256 N.J. at 19. The court's decision should be reversed on appeal only if its findings were "so wholly unsupportable as to result in a denial of justice." N.J. Div. of Youth & Fam. Servs. v. P.P., 180 N.J. 494, 511 (2004) (quoting In re Guardianship of J.N.H., 172 N.J. 440, 472 (2002)); see also N.J. Div. of Child Prot. & Permanency v. D.A., 477 N.J. Super. 63, 80 (App. Div. 2023).

We review the trial court's legal conclusions de novo. R.G., 217 N.J. at 552-53; see also D.C.A., 256 N.J. at 19 (acknowledging appellate courts give no deference to the trial court's interpretation of N.J.S.A. 30:4C-15.1(a)).

III.

Guided by these principles, we consider defendants' challenges to the court's findings under each prong of the best-interests test.

Prong One

Under the first prong, "the Division must prove harm that 'threatens the child's health and will likely have continuing deleterious effects on the child.'" N.J. Dep't of Child. & Fams. v. A.L., 213 N.J. 1, 25 (2013) (quoting K.H.O., 161 N.J. at 352). The Division need not "wait 'until a child is actually irreparably impaired by parental inattention or neglect.'" F.M., 211 N.J. at 449 (quoting D.M.H., 161 N.J. at 383). "Children have their own rights, including the right to a permanent, safe and stable placement." N.J. Div. of Youth & Fam. Servs. v. C.S., 367 N.J. Super. 76, 111 (App. Div. 2004). "When the condition or behavior of a parent causes a risk of harm, such as impermanence of the child's home and living conditions, and the parent is unwilling or incapable of obtaining appropriate treatment for that condition," prong one is satisfied. N.J. Div. of Youth & Fam. Servs. v. H.R., 431 N.J. Super. 212, 223 (App. Div. 2013). The requisite harm is also established by a parent's withdrawal of nurture and care for an extended period of time. D.M.H., 161 N.J. at 379. Additionally, "[a]lthough drug use alone is not enough to show harm, 'guardianship cases . . .

14

often address long-term problems that affect a child's welfare.'" H.R., 431 N.J. Super. at 221-22 (omission in original) (quoting A.L., 213 N.J. at 24-25).

In considering prong one, Judge Wright found defendants had caused two removals that resulted in demonstrable psychological harm to Lily, including the "fawning" behavior credibly described by Dr. Stillwell. The judge concluded Lily had been denied the stability and safety necessary for healthy psychological and emotional growth.

Regarding Mary specifically, the judge determined she had "struggled with unaddressed substance misuse since the time of [Lily's] original removal in 2020." The judge credited testimony from the Division's witnesses that Mary had not engaged in treatment once during the five years since Lily's removal, had failed to achieve any period of sobriety, had limited contact with the Division and only sporadically attended visitation, with a year-long absence in 2023. The judge noted that Dr. Stilwell could not complete a psychological evaluation because of Mary's disengagement—she curled up in a ball, slept, and would not keep her eyes open for more than a few seconds. Judge Wright noted further that Mary had told caseworkers she did not want reunification and instead hoped Peter would reunify so she could remain in contact with Lily, implying Mary did not consider herself a placement option. The judge accepted

Dr. Stilwell's opinion that Mary was not an appropriate parent and had made no progress toward becoming one. Thus, Judge Wright concluded the Division had provided clear and convincing evidence to establish prong one as to Mary.

Regarding Peter, the judge recognized his prior progress with substance abuse treatment but found that after his relapse and Lily's second removal in March 2024, Peter failed to complete any treatment program and continued testing positive for substances. The judge noted the Division's efforts to transport Peter to the Straight and Narrow program and Peter's failure to appear. The judge further cited Dr. Stilwell's testimony explaining Peter could not be evaluated because he was falling asleep and his visitation with Lily was sporadic.

Substantial credible evidence supports the judge's findings under prong one as to both defendants. The record reflects Mary continued using substances daily well into 2024 and either declined or abandoned treatment opportunities. Dr. Stilwell's testimony established Mary remained emotionally unstable, unpredictable, and unable to provide Lily with a secure attachment or a safe parenting environment.

Peter admitted he relapsed in March 2024 and thereafter tested positive for cocaine, fentanyl, morphine, marijuana, and other substances on multiple

A-3392-24

occasions. The judge also credited testimony that Peter appeared impaired during visitation and evaluations, lost stable housing and employment, and failed to attend admissions appointments for treatment despite extensive Division assistance. The judge's conclusion that Lily's safety and development remained endangered by Peter's inability to maintain sobriety and stability after reunification was thus supported by substantial credible evidence in the record. See H.R., 431 N.J. Super. at 223 (recognizing harm may arise where a parent is unwilling or incapable of obtaining appropriate treatment for a condition causing instability and impermanence).

We are unpersuaded by Mary's argument that the judge's finding of harm to Lily was based on substance abuse alone. Judge Wright found the instability threatening Lily derived from Mary's longstanding and untreated substance abuse, but neither that condition nor Mary's homelessness or poverty alone comprised the harm required under prong one. On the contrary, it was instability, lack of permanency, and psychological harm manifested in Lily's "fawning" behavior that the judge identified as the direct harm under prong one. For the same reason, we reject Peter's argument that the judge's finding as to him was based solely on homelessness, poverty, or incarceration.

17

We reject Peter's contention that the judge impermissibly relied solely on Dr. Stillwell's testimony for his conclusion on prong one. Judge Wright also relied on extensive documentary evidence and caseworkers' testimony, all of which he found credibly corroborated Peter's continued substance abuse and instability.

In sum, the judge's finding that prong one was satisfied because defendants' parental relationship endangered Lily is supported by the record.

Prong Two

Under prong two, "the inquiry centers on whether the parent is able to remove the danger facing the child." F.M., 211 N.J. at 451; see also D.C.A., 256 N.J. at 27 (finding prong two as amended was intended "to ensure that parental fitness—not the child's bond with resource parents—is the core inquiry when a judge considers the best[-]interests standard's second prong in a termination of parental rights case").

Judge Wright found the Division repeatedly offered Mary services, but apart from supervised visits, she refused to engage. The judge determined Mary had failed to achieve any sobriety and failed to participate in substance abuse treatment.

Although Mary had limited, positive interactions with Lily, the judge noted she could not address her substance use or consistently attend supervised visits. Mary was present and positive during bonding evaluations with Lily, but once Lily was gone, Mary presented differently, "almost as if a switch was flipped." According to Dr. Stilwell's testimony, Mary could "pull it together at least for a short time." The judge determined Mary did not want reunification because she expected to have a relationship with Lily through Peter.

We discern no basis to disturb the judge's findings on prong two as to Mary. The judge accepted Dr. Stilwell's testimony that Mary was unpredictable and would not provide a healthy or secure bond with Lily. Judge Wright concluded it was highly unlikely that, after five years, Mary's behavior would change.

Mary argues the judge improperly relied on her ongoing substance use without sufficiently considering the underlying trauma associated with her childhood experiences and her mother's death. Contrary to the record, Mary further contends she continued to express interest in treatment and maintained a loving relationship with Lily. However, the judge's finding under prong two is supported by the record. Although Mary occasionally expressed interest in treatment, Judge Wright found she consistently failed to follow through with

19

services, failed to achieve sobriety, disengaged from visitation for extended periods, and remained unable to provide permanency or stability for Lily.

In analyzing prong two as to Peter, the judge concluded based on Peter's conduct before the second removal and throughout the subsequent litigation that he was not a safe and stable parent and was unlikely to become one in the foreseeable future. The judge found that after the second removal Peter expressed interest in substance abuse treatment but did not actually attend a program and repeatedly delayed treatment. The judge noted visitation with Lily had to be delayed in 2024 because of his positive fentanyl test. The judge further found Peter was still testing positive for fentanyl and heroin as of February 2025. Thus, Judge Wright credited Dr. Stilwell's testimony that there was a low likelihood Peter would become a viable parent.

Peter argues the judge failed to sufficiently consider his successful reunification with Lily and contends his relapse should not outweigh the substantial progress he made after the first guardianship trial. We reject this argument. Judge Wright recognized Peter's historical reunification efforts but emphasized that since Lily's second removal, Peter has failed to take meaningful steps toward achieving sobriety and stability. "We have made it clear that '[c]hildren must not languish indefinitely in foster care while a birth parent

20

attempts to correct the conditions that resulted in an out-of-home placement.'" N.J. Div. of Youth & Fam. Servs. v. L.J.D., 428 N.J. Super. 451, 483-84 (App Div. 2012) (alteration in original) (quoting N.J. Div. of Youth & Fam. Servs. v. S.F., 392 N.J. Super. 201, 210 (App. Div. 2007)).

The judge also properly considered Lily's need for permanency. See K.H.O., 161 N.J. at 357-58. At the time of trial, Lily had experienced years of instability, two removals, a failed reunification, and prolonged uncertainty regarding permanency. The judge found further delay in permanency "unconscionable," contrary to Lily's right to permanency, and likely to cause further harm.

In sum, we discern no error in Judge Wright's finding that defendants remained unable to eliminate the harm facing Lily and delaying permanency further would compound the harm she has already suffered.

Prong Three

Prong three, N.J.S.A. 30:4C-15.1(a)(3), requires the Division to make "reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home[,]" and the court to "consider[] alternatives to termination of parental rights." As to the first part of prong three, the reasonableness of the Division's efforts is not

conditioned on their success. L.J.D., 428 N.J. Super. at 488. The success or failure of the Division's efforts will "not foreclose a finding that the Division met its statutory burden to try to reunify the children with the family." Ibid. (quoting N.J. Div. of Youth & Fam. Servs. v. F.H., 389 N.J. Super. 576, 620 (App. Div. 2007)). "Experience tells us that even [the Division]'s best efforts may not be sufficient to salvage a parental relationship." F.M., 211 N.J. at 452.

As to the second part of the third prong, the Division must "prove by clear and convincing evidence that 'alternatives to termination of parental rights' have been appropriately considered." N.J. Div. of Youth & Fam. Servs. v. J.S., 433 N.J. Super. 69, 87 (App. Div. 2013) (quoting N.J.S.A. 30:4C-15.1(a)(3)).

Under prong three, the judge found the Division made reasonable efforts to provide services to both parents and considered alternatives to termination. As to Mary, the judge found the trial testimony established Division caseworkers had tried "over and over" to engage Mary in substance abuse treatment, and offered housing assistance, therapeutic supervised visits, transportation to evaluations, visitation and court, along with financial assistance. As to Peter, the judge observed the Division had offered largely the same services and acknowledged he had at one point completed services that led to reunification. The judge noted Peter initially failed to engage, but that changed in March 2022,

after which he undertook what Judge Wright described as "heroic participation in service and a steady climb to sobriety and reunification." However, the judge concluded that after reunification Peter could not maintain sobriety while managing the stress of parenting. The judge also recognized services were provided to Lily, including visits to the resource home, therapy, and pediatric medical services.

Regarding alternatives to termination, the judge noted the Division reached out to maternal and paternal family members for potential placement, but they were ruled out, and another family member had declined placement because of Lily's connection to her current resource parents. Judge Wright determined the resource parents were not interested in KLG and would only adopt.

Mary argues the Division failed to provide services adequately addressing the underlying trauma contributing to her substance abuse and further contends the judge improperly favored adoption over KLG without sufficient evidence the resource parents made an informed choice. Peter similarly argues the Division's efforts were unreasonable and contends the judge improperly favored adoption over KLG. We find no merit in these arguments.

23

The Division was required to make reasonable efforts. See L.J.D., 428 N.J. Super. at 487-88. Substantial credible evidence supports the judge's finding that the Division made extensive and reasonable efforts to assist Mary. Throughout the litigation, the Division provided or arranged for substance-abuse evaluations, inpatient and outpatient treatment referrals, therapy referrals, transportation assistance, visitation, psychological evaluations, and engaged in repeated outreach efforts. The Division also discussed therapy related to Mary's trauma and grief, but Mary declined those services.

The record demonstrates the Division provided Peter with extensive services over several years, including substance-abuse evaluations, inpatient and outpatient treatment referrals, sober-living assistance, rental and housing support, transportation, visitation, and hotel accommodations to facilitate treatment admissions. Those efforts initially succeeded in reunifying Peter with Lily. The fact that reunification later failed does not render the Division's efforts unreasonable. See L.J.D., 428 N.J. Super. at 488. Rather, the record supports Judge Wright's conclusion that after Peter's relapse he repeatedly failed to avail himself of any further Division-offered services.

The judge also determined the Division had considered alternatives to termination. The record reflects the Division assessed multiple relatives for

placement, including interstate options, and revisited KLG after the first guardianship trial. However, relatives either declined placement, failed to obtain ICPC approval, withdrew from consideration, or were otherwise determined unsuitable.

Mary argues Lily's maternal grandparents and maternal aunt, who reside in Florida, were ruled out on the basis of a wrongfully administered ICPC. See N.J.S.A. 9:23-5, art. VIII, subd. (a) (exempting grandparents and aunt and uncle placements from the ICPC process). Because Mary did not raise this argument before the trial court, we review for plain error. See R. 2:10-2 ("Any error or omission shall be disregarded by the appellate court unless it is of such a nature as to have been clearly capable of producing an unjust result.").

We are unconvinced the judge's decision regarding prong three was plainly erroneous based on the wrongful administration of the ICPC. Regardless of the results of the ICPC process, the relatives were ruled out based on their assertions they were unable to serve as Lily's caregivers and preference Lily reside with her resource parents, who facilitated contact with them. Mary contends the relatives' responses could have been tainted by "the misperception that [their] involvement with [Lily] would be fraught with procedural requirements." We decline to conclude this speculative assertion is plain error.

Mary's argument is also belied by the relatives' responses to the Division's inquiry, including the statement by Lily's maternal aunt that she "is at the right place with [the resource parents]," and that neither her nor Lily's maternal grandparents could care for Lily, because the aunt had five children of her own and the grandparents were "very sick."

Peter argues the judge erred by elevating adoption over KLG as a preferred placement option when recent amendments to the best-interests, KLG, and removal statutes reflect the Legislature's intent to preserve the parent-child relationship wherever possible. See D.C.A., 256 N.J. at 23-26 (discussing the 2021 amendments). We disagree. While Peter is correct that the Legislature's "objective [was] to promote kinship caregivers and preserve family bonds," id. at 27, it selected a discrete means of achieving that goal, namely modification of one prong of the best-interests test, not wholesale preference for KLG over adoption. The limited impact of the amendments on the best-interests test is to require consideration of a child's bond with their resource parents under prong four, rather than prong two. See id. at 28.

Here, in its prong three analysis, the judge appropriately considered both KLG and adoption and concluded the latter represented the only viable permanency path for Lily under the circumstances. The resource parents

expressed an informed unwillingness to pursue KLG, and the judge properly credited testimony establishing Lily required permanency and stability after enduring years of uncertainty.  The judge did not treat adoption as presumptively preferable but instead concluded the permanency offered by adoption best served Lily's interests.

Prong Four

Prong four, N.J.S.A. 30:4C-15.1(a)(4), "serves as a fail-safe against termination even where the remaining standards have been met."  N.J. Div. of Youth & Fam. Servs. v. G.L., 191 N.J. 596, 609 (2007).  "The question ultimately is not whether a biological mother or father is a worthy parent, but whether a child's interest will best be served by completely terminating the child's relationship with th[e] parent."  E.P., 196 N.J. at 108.  In making that determination, the court may consider evidence regarding the bond between the child and the resource parents.  See D.C.A., 256 N.J. at 28 (holding the 2021 amendment to N.J.S.A. 30:4C-15.1(a) "precludes a court from considering the bond between a child and resource parents under the second prong of the best[-]interests standard but does not bar such evidence when the court addresses that standard's fourth prong").

Under prong four, Judge Wright found termination would not do more harm than good. The judge stated "the material, relevant, and credible proofs offered at trial[] established clearly and convincingly that [Lily's] best chance at a safe and nurtured childhood requires termination of parental rights for both parents." The judge emphasized that "[t]he overriding consideration under prong four is the child's need for permanency," and Lily had been denied permanency for five years.

As to Peter, the judge found that although Lily loves her father, his inability to maintain sobriety while handling the stressors of parenting made it impossible for him to provide the permanency to which Lily was legally entitled. As to Mary, the judge found Lily had only an insecure attachment to her mother and that Mary's refusal to engage in services left her unviable as a parent. Judge Wright further explained that Lily was doing well in her resource parents' care and was engaged in therapy to address psychological harm caused by defendants. The judge credited Dr. Stilwell's opinion that the resource parents could mitigate harm from termination of her insecure parental relationships with her biological parents.

Mary argues the judge relied too heavily on Dr. Stilwell's testimony and failed to give sufficient consideration to evidence demonstrating she loved Lily

28

and maintained affectionate interactions with her. Mary contends "[t]ermination of parental rights is an extreme outcome that should be reserved for instances where the evidence clearly and convincingly shows maintaining the parent-child relationship is of no possible benefit to the child." Thus, in light of a record of affectionate supervised interaction with Lily, Mary maintains the judge's conclusion was against the weight of the evidence.

On this point, Mary misstates the law. The inquiry under prong four is "whether a child's interest will best be served by completely terminating the child's relationship with that parent." E.P., 196 N.J. at 108. The Division is not obligated to show the parental relationship confers "no possible benefit to the child." On the contrary, where a parent "has been unable to remediate the danger to the child, and when the child has bonded with foster parents who have provided a nurturing and safe home . . . [the] termination of parental rights likely will not do more harm than good." Ibid.

Here, the judge credited Dr. Stilwell's testimony that, although Lily maintained affection for Mary, the relationship was insecure. Dr. Stilwell further testified Lily's years of instability contributed to trauma-related emotional harm and that Lily's strongest and healthiest attachments were with her resource parents. Further, the record demonstrates Lily's resource parents

were committed to adoption and declined KLG. This represents substantial credible evidence that maintenance of Mary's parental rights, resulting in continued impermanency would ultimately cause more harm than good.

We are unconvinced by Peter's argument the judge conducted a simple "better-off" analysis under the fourth prong when the statute calls instead for a focus on the "harm that would befall Lily her if her relationship with Peter [were] terminated." Peter maintains the harm would be considerable given the demonstrable bond between Lily and her father.

Judge Wright did not misapply the law under prong four. Instead, the judge recognized the importance of Lily's need for permanency—rightfully a "central factor" in the court's determination, K.H.O., 161 N.J. at 357—and found Peter was unable to provide that permanency. The judge recognized Peter's relationship with Lily and the harm that may ensue from termination but determined that any harm could be ameliorated by the resource parents. We are satisfied this conclusion is supported by substantial credible evidence in the record.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division